## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DARNELL COOPER, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:17-CV-04092 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CHARLES BEST *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

Darnell Cooper brings this lawsuit against correctional staff at Stateville Correctional Center, alleging that they deprived him of his liberty without due process when they put him in segregation for nine months for a disciplinary offense that he did not commit. R. 135, Third Am. Compl.[1] Defendants Charles Best, Lakeisha Acklin, Theodore Frederick, William Shevlin, Xavier Taylor, Michael Range, Tarry Williams, and Artis Johnson all move to dismiss the case for failing to state a claim, arguing that Cooper has not alleged that he was actually denied due process in the disciplinary hearing at issue. R. 142, Defs.' Mot.; R. 148, Def. Johnson's Mot. In the alternative, all of the Defendants except for Best and Acklin argue that their personal involvement in the disciplinary process was not sufficient to trigger liability. Defs.' Mot. at 7. For the reasons discussed in this Opinion, the motions of all of the Defendants except for Best and Acklin are granted.

---

[1]Citations to the record are noted as "R." followed by the docket entry. The Court has subject matter jurisdiction over this Section 1983 lawsuit under 28 U.S.C. § 1331.

## I. Background

The Court accepts all well-pleaded factual allegations in the Complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In September 2014, Darnell Cooper was an inmate at Stateville Correctional Center. Third Am. Compl. ¶ 1. On September 26, a correctional officer named Brett Carnahan performed a search, or "shake-down," of Cooper's cell, number 807 in cell-house B. *Id.* ¶ 5. During this search, Carnahan discovered a piece of rusted metal, which Carnahan characterized as a shank, just outside Cooper's cell—specifically in the track of his cell door. *Id.* ¶¶ 6–7, 9. Cooper contends that he had no idea the metal was there. *Id.* ¶ 27. That night, Cooper was interrogated about the incident by Officer William Shevlin in the prison's internal affairs office. *Id.* ¶ 8. During this interrogation, Shevlin said to Cooper: "you or your cellie got to[] take the weight for that shank or both of y[']all are going to seg[regation] for it." *Id.* ¶ 9. Shevlin knew, however, that other inmates had not been disciplined when pieces of thoroughly rusted metal were found in the tracks of their cell doors. *Id.* ¶ 10. After his encounter with Shevlin, Cooper was returned to his cell, where he and his cellmate, Tracy Williams, were ordered to pack their things and were taken to segregated housing. *Id.* ¶ 11. A correctional staffer named Artis Johnson checked the box for "temporary confinement" on Cooper's disciplinary report and signed it. *Id.* ¶ 12.

The next day, September 27, Cooper was again interrogated in the internal affairs office, this time by Xavier Taylor. Third Am. Compl. ¶ 13. Echoing Shevlin's warning, Taylor told Cooper that the warden wanted "someone to go down" because

2

too much metal was being found without inmates being punished for it. *Id.* ¶ 14. After this interrogation, Cooper was taken back to his cell in segregation. *Id.* ¶ 16. Defendant Theodore Frederick marked the September 26 disciplinary report as a "major" infraction and decided to keep Cooper in segregation. *Id.* ¶ 17. Officer Range was the "hearing investigator" for Cooper's alleged infraction. *Id.* ¶ 18. The role is not defined in the complaint, but according to Cooper, Range refused to conduct an independent investigation into Cooper's alleged misconduct, presumably relying on the work done by the officers already named. *Id.* Johnson, Frederick, and Range all knew, as Shevlin knew, that other inmates had not been disciplined when pieces of thoroughly rusted metal were found in their cell door tracks. *Id.* ¶¶ 12, 17, 19

On September 29, Cooper wrote a letter to the warden, Tarry Williams, asking for an investigation into the incident of September 26 and asking to be released from segregated confinement. Third Am. Compl. ¶ 19. The next day, September 30, Cooper appeared before the Adjustment Committee for a hearing conducted by Charles Best and Lakeisha Acklin. *Id.* ¶ 20. Cooper asked for a continuance so that he could call five witnesses, and so there would be more time to investigate the incident. *Id.* ¶ 21. He also gave Best a statement that he (Cooper) had written. *Id.* But the hearing officers did not grant a continuance and never spoke to the five witnesses that Cooper had wanted to call. *Id.* ¶ 22. They found him guilty of a "dangerous contraband" offense related to the shank, and of a "contraband/unauthorized property" offense related to a fan of some sort. R. 135 at 28, Pl.'s Exh. 3, Adjustment Comm. Report. The committee recorded the names of all five witnesses that Cooper asked to call, along

3

with a note that for each witness, their testimony would be irrelevant. *Id.* The Committee recommended disciplinary action of one year each for classification in C-Grade, Segregation, and commissary restriction. R. 135 at 29, Pl.'s Exh. 3A, Adjustment Comm. Report Page 2. Also on September 30, Cooper received Warden Williams's response to his letter, in which Williams said that Cooper's "concerns are being reviewed and referred if necessary to the appropriate individual for resolution." Third Am. Compl. ¶ 23; R. 135 at 31, Pl.'s Exh. 5, Williams Letter 1.

On November 3, Cooper filed a formal grievance about the September 26 incident. Third Am. Compl. ¶ 24; R. 135 at 32, Pl.'s Exh. 6, November Grievance. Although the copy of the grievance submitted to the Court is very difficult to read, it appears to focus mostly on his claim that he did not know about the piece of metal in the door track and should not have been blamed for it. November Grievance. A few weeks later, around November 29, Cooper received the Grievance Officer's Report, which is dated November 24. Third Am. Compl. ¶ 25; R. 135 at 34, Pl.'s Exh. 7, Grievance Officer's Report. The Grievance Officer took Cooper's side, first finding that "the disciplinary report does not indicate the cell was shook down prior to the offender moving into the cell." Grievance Officer's Report. The Officer further noted that "*the disciplinary report is very vague* and based on the fact the weapon had to be 'dug' up in the track of the door and nowhere in the report does it state if the dirt/debris appears to be fresh, there is reasonable belief the weapon had been there for an extended period of time." *Id.* (emphasis apparently added on to exhibit). As a result, the Grievance Officer recommended that the disciplinary report be expunged. *Id.*

4

Even after the Grievance Officer recommended expungement for Cooper, however, he remained in segregation. Third Am. Compl. ¶¶ 26–27. The warden, Williams, did not concur with the recommendation and left the discipline in place. *Id.* ¶ 26. On December 1 or 2, Cooper wrote to Williams again, asking to be let out of segregation. *Id.* ¶ 28; R. 135 at 35–36, Pl.'s Exh. 8, Cooper Letter 2.[2] The warden's response was virtually identical to his response to the first letter back in September. *Id.* ¶ 29. On December 2 or 4, Cooper filed another grievance, this time claiming that Best violated his right to call witnesses at the Adjustment Committee hearing. *Id.* ¶ 30.[3] This grievance was returned to Cooper with a note stating, "This grievance was already addressed on Grievance #3860." *Id.* (all-caps omitted).

Cooper alleges that he spent a total of about nine months in segregated confinement. Third Am. Compl. at 19–20 (unnumbered paragraphs). He does not explain how or why he was ultimately released—presumably, he was released sometime between the Grievance Officer's recommendation on November 29, 2014, and the date in September 2015 when his year would have expired.[4] Cooper does claim that every single defendant knew that other inmates had not been punished when rusted metal

---

[2]Cooper's Complaint says that he sent the letter on December 1, but the letter itself is dated December 2. The difference is immaterial.

[3]This grievance is also attached to the complaint and is nearly impossible to read, but the words "due process" can be made out. R. 135 at 38, Pl.'s Exh. 10, December Grievance. The Complaint says the grievance was filed on December 2, but the date on grievance itself appears to read "12-4-14." Third Am. Compl. ¶ 30; December Grievance. The difference is immaterial.

[4]The defense explains that Cooper was released from segregation on the recommendation of the Administrative Review Board. Defs.' Mot. at 2. No documentation of the release is currently in the record.

was found in their cell door tracks. *Id.* Cooper alleges in some detail that his conditions of confinement while in segregation constituted an atypical hardship. *Id.* ¶¶ 31–45. Brown liquid dripped over his bed, and his cell was extremely cold and infested with feces. *Id.* ¶¶ 32–34. Cooper also describes an incident in which his left hand was shut in his cell door, causing him a lasting injury. *Id.* ¶¶ 37–45.

Cooper filed this action, without a lawyer, back in May 2017. R. 1, Original Compl. At the screening review stage, the Court dismissed the original complaint for impermissibly joining unrelated claims, because he was trying to sue nine defendants for denying him due process in the disciplinary proceeding, as well as an additional 12 defendants for an unrelated medical care claim. R. 13, Order. The Court gave Cooper a deadline to file an amended complaint. *Id.* Although Cooper missed the deadline, he was ultimately permitted to file an amended complaint against the current defendants, this time focusing solely on the alleged lack of due process in the disciplinary proceeding that landed him in segregation for nine months. R. 26, First Am. Compl. This complaint passed the screening review, although the Court dismissed Carnahan from the case on the basis that he had not personally participated in a constitutional violation. R. 22, Order at 3. Cooper's second amended complaint was accepted in April 2019. R. 52. In May 2019, the Court recruited counsel to represent Cooper. R. 58, Minute entry. In January 2020, the Defendants filed a motion for summary judgment based on the statute of limitations, R. 98, which the Court denied, R. 129, Mem. Op. and Order. Early this year Cooper, now represented by counsel, requested leave to file a Third Amended Complaint substituting Artis Johnson as

6

defendant for a previously named "M.A. Johnson." R. 133, Mot. for Leave to File. That motion was granted, R. 134, and the Third Amended Complaint is the operative one now, R. 135. The Defendants soon thereafter filed their motion to dismiss the case for failure to state a claim. R. 142.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).[5] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). These allegations

---

[5]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

"must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

### III. Analysis

The Defendants raise two arguments for why this action should be dismissed against some or all of them. As an initial matter, they concede that at the pleading stage, Cooper's allegations establish that the nine months he spent in segregated custody were an "atypical hardship" that triggered his liberty interest, meaning that he had a right to receive due process before receiving the punishment. R. 154, Defs.' Reply at 5; *see Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697–98 (7th Cir. 2009). But they contend that Cooper has *not* adequately alleged that he was, in fact, deprived of due process. Defs.' Mot. at 4. In the alternative, Defendants Frederick, Johnson, Range, Shevlin, Taylor, and Williams argue that even if the Court holds that Cooper was deprived of due process, they were not personally involved in any due process violations and so they should be dismissed from the case. *Id.* at 7; Johnson's Mot. at 2. Each argument will be addressed in turn.

### A. Due Process

When the punishment for a prison disciplinary action threatens a prisoner's liberty interest, courts must examine whether the procedures used to impose the discipline were constitutionally adequate. *See Lekas v. Briley*, 405 F.3d 602, 607 (7th Cir. 2005). A prisoner facing the deprivation of his protected liberty interest has a right to receive:

8

> (1) advance (at least 24 hours before hearing) written notice of the claimed violation; (2) the opportunity to be heard before an impartial decision maker; (3) the opportunity to call witnesses and present documentary evidence (when consistent with institutional safety); and (4) a written statement by the fact-finder of the evidence relied on and the reasons for the disciplinary action.

*Rasheed-Bey v. Duckworth*, 969 F.2d 357, 361 (7th Cir. 1992). Inmates do not, however, have an absolute right to call any witness or present any evidence that they choose: the prison's disciplinary officials may deny requests to present "irrelevant or repetitive evidence" without violating the inmate's due process rights. *Scruggs v. Jordan*, 485 F.3d 934, 939–40 (7th Cir. 2007). Cooper does not seriously dispute that he received adequate notice of the hearing, was heard by an impartial decision maker, or received an adequate written statement about the Adjustment Committee's decision. R. 153, Pl.'s Resp. at 11–12; Defs.' Reply at 3.

Instead, the parties' core dispute concerns whether Cooper had a meaningful opportunity to call witnesses during his disciplinary hearing. Cooper contends that he did not. Pl.'s Resp. at 11–12. He points to the Adjustment Committee's refusal to call any of the five witnesses that he wanted to present, and in particular to the testimony that inmate Earl Marshall would have given. *Id.* Marshall allegedly would have testified about similar incidents of rusted metal being found in cell-door tracks. *Id.* at 11; R. 135 at 40, Pl's. Exh. 12, Marshall Decl. Cooper says that Anna McBee, the grievance officer who reviewed his grievance and recommended that his disciplinary record be expunged, considered Marshall's proposed testimony in arriving at her recommendation, and that consideration illustrates the testimony's relevance. Pl.'s Resp. at 11–12. For their part, the Defendants contend that Cooper had the

9

opportunity to propose witnesses—as illustrated by the hearing record naming them—but that the Adjustment Committee appropriately refused to call them because its members concluded that the testimony would not have been relevant. Defs.' Mot. at 6. The Defendants point to the provisions of the Illinois Administrative Code requiring the Committee to only consider "any statements of witnesses with *relevant* knowledge of the incident who are reasonably available." *Id.* (citing 20 Ill. Admin. Code § 504.80(i) (emphasis added)).

Cooper has adequately alleged that his due process rights were violated when the Adjustment Committee refused to call the witnesses that he proposed. Best and Acklin concluded that Cooper's proposed witnesses' testimony would have been irrelevant, but they did not explain why or how they reached that conclusion, either in the original Final Summary Report of the hearing or in the briefing on this motion. Adjustment Comm Report (stating only "Testimony Would Be Irrelevant" without further explanation); Defs.' Mot. at 6; Defs.' Reply at 4.[6] Taking Cooper's allegations as true, as is required at this stage, the Grievance Officer who recommended expunging his report *did* speak to one of his witnesses, which plausibly suggests that the witness's testimony would have been relevant. Marshall's affidavit describes an incident that took place several days before Cooper's alleged infraction, in which rusty metal was found just outside Marshall's cell, but Marshall was not punished, in part

---

[6]The Defendants do not argue that calling witnesses would have disrupted institutional safety or correctional goals, which is the other possible justification for refusing to call witnesses. *Rasheed-Bey*, 969 F.2d at 361; *see also Chavis v. Rowe*, 643 F.2d 1281, 1286 (7th Cir. 1981).

because the metal had been there for several years. Marshall Decl. ¶¶ 3–7. Testimony about how frequently rusted shanks are found near cell doors, and how they are normally viewed by correctional officers, could well have been relevant to the disciplinary decision. Even setting Marshall aside, the standalone facts that McBee recommended expunging Cooper's record, and that his punishment was ultimately cut short, suggest that the Adjustment Committee made a constitutional error by refusing to hear *any* of the witnesses, or even just accept written statements from them.

In some cases, the Seventh Circuit has held that inmates received due process even when they were not permitted to call witnesses, but those cases are distinguishable from Cooper's. In *Scruggs v. Jordan*, the Seventh Circuit held that a prisoner who was not permitted to call live witnesses had nevertheless received due process in his disciplinary proceedings—but that prisoner *was* permitted to collect and submit the witnesses' written statements, and in any event had confessed to the charged conduct, which was an assault of another inmate. 485 F.3d at 939–40. By contrast, Cooper vehemently disputes that he was in possession of the rusted shank in his cell-door track, and he was not allowed to submit any form of testimony in his own support. Third Am. Compl. ¶¶ 22–23, 27. In *Piggie v. Cotton*, the Seventh Circuit held, at the more demanding summary judgment stage, that an inmate had not suffered a deprivation of due process despite not being permitted to call a witness, because the record provided no explanation of how that witness's testimony could have been relevant. 344 F.3d 674, 678 (7th Cir. 2003). Cooper, by contrast, has provided in his pleadings a theory of relevancy for his witnesses, and has filed affidavits from them

11

that support that theory. Under the circumstances of this case, it is plausible that refusing to call Cooper's proposed witnesses amounted to a due process violation. This is enough to survive the dismissal stage.

As the factual record continues to develop, it may turn out that Cooper's due process rights were not actually violated. It is worth noting that the Seventh Circuit has held that inmates' requests to call witnesses must be timely, and that a day-of-hearing request is not necessarily timely, because it may disrupt prison processes, "raise the level of confrontation between the prison staff and the inmate," or simply serve as a delay tactic—particularly when accompanied by a request for a continuance, as in this case. *Sweeney v. Parke*, 113 F.3d 716, 720 (7th Cir. 1997) (*disapproved of on other grounds by White v. Indiana Parole Bd.*, 266 F.3d 759 (7th Cir. 2001). But the operative complaint reflects that Cooper had his witnesses' names ready on the day of the hearing, and the defense has not suggested that it would have been disruptive to call them—their argument rests solely on relevance. Defs.' Mot. at 6–7; Defs.' Reply at 4–5. (It is also difficult to imagine what Cooper would have had to gain from delaying his disciplinary hearing, since he was already in segregation. Third Am. Compl. ¶¶ 11–12, 16, 27.)

And of course, the Court is currently accepting all of Cooper's allegations as true, which is favorable treatment that he will not receive at the summary judgment stage if discovery refutes his allegations. It is worth noting that the Grievance Officer's Report does not state explicitly that McBee spoke to any of Cooper's witnesses. Grievance Officer's Report. McBee does base her findings "*upon a total review of all*

*available information,*" *id.* (emphasis apparently added to the exhibit), and Cooper contends that McBee "conduct[ed] an independent investigation," Third Am. Compl. ¶ 18. Coupled with his consistent assertion in his brief that McBee spoke with Marshall, and the broader context already discussed, this is enough to allege that Cooper's witnesses were relevant to the disciplinary charge against him. Pl.'s Resp. at 11–12.

Cooper has stated a claim for violation of his due process rights, based on the fact that he was not permitted to call witnesses or to have their statements considered as part of the disciplinary process. The next question is whether all of the Defendants in this case should be required to answer to that charge.

## B. Personal Involvement

Defendants Frederick, Johnson, Shevlin, Taylor, Range, and Williams all argue that Cooper has failed to allege that they participated in any alleged violations of his due process rights. Defs.' Mot. at 7; Johnson's Mot. at 2. To state a claim against these defendants under Section 1983, Cooper must allege that they "caused or participated in" the deprivation of his constitutional rights. *Pepper v. Village of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005) (cleaned up); *see also Gentry*, 65 F.3d at 561. At the outset, it is crucial to remember that the alleged violation of Cooper's due process rights was the refusal to hear from his proposed witnesses. Since Acklin and Best are the ones who refused to call the witnesses, they are proper defendants to the claim— and they wisely do not attempt to argue otherwise. But Cooper has not alleged facts that establish a sufficient degree of personal responsibility in any of the other

13

witnesses. The Court will address each defendant in turn, in an order that roughly matches their involvement with Cooper's discipline.

### 1. Shevlin

Internal affairs officer William Shevlin interrogated Cooper about the rusted metal in the cell-door track on September 26, 2014, the same day the shank was found. Third Am. Compl. ¶¶ 8–10. Cooper alleges that Shevlin knew that inmates were not usually disciplined for metal found in similar locations, but that Shevlin nevertheless threatened him with segregation for the infraction. *Id.* ¶¶ 9–10. But Shevlin had no involvement in the actual disciplinary hearing against Cooper, which did not take place until September 30. *Id.* ¶ 20. There is no allegation that he was involved in any way in the decision not to talk to Cooper's proposed witnesses, or that he had any authority to get involved. His role appears to have been limited to interviewing Cooper about the alleged offense. Cooper thus has not alleged that Shevlin was personally involved in the deprivation of his rights.

### 2. Johnson

Artis Johnson signed and checked the box for "temporary confinement" on Cooper's disciplinary report, which contributed to Cooper being put in segregation while he awaited his hearing in front of the Adjustment Committee. Third Am. Compl. ¶ 12. This took place on September 26 (the day that the metal was found), which was four days before the hearing. Like Shevlin, Johnson played no role in the decision to deny Cooper's request for witnesses.

Cooper alleges that Johnson "condoned and 'TURNED A BLIND EYE' to the illegal and malicious placement of Plaintiff in seg." Third Am. Compl. ¶ 12 (capitalization in original). It is true that in some circumstances, supervisory officials can be held liable under Section 1983 for conduct in which they did not personally participate, if it is alleged that they "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988); *see also Gentry*, 65 F.3d at 561. But Cooper has not alleged that Johnson was a supervisor of Best and Acklin, that Johnson had any knowledge of the upcoming decision to refuse to call Cooper's proposed witnesses, or that Johnson had any authority to intervene if he did know about it. Again, the proper focus is on the specific defendant's involvement in the deprivation of Cooper's constitutional rights, which the Court agrees occurred when Best and Acklin refused to call any of Cooper's witnesses. Johnson's involvement in the case preceded Best and Acklin's, and there is no allegation in the Complaint to tie him to the decision about the witnesses, or to place him in the chain of command above Best and Acklin. Cooper thus has failed to state a claim against Johnson.

### 3. Taylor

Cooper alleges that Xavier Taylor interrogated him about the incident at issue on the morning of September 27, the day after the rusted metal was found. Third Am. Compl. ¶ 13. Taylor allegedly told Cooper that "the warden wants someone to go down" for the metal. *Id.* ¶ 14. But again, Taylor's involvement in Cooper's discipline

began and ended here. Cooper thus has failed to state a claim against Taylor for the same reasons he failed to state a claim against Shevlin.

### 4. Frederick

According to Cooper, Theodore Frederick decided that Cooper's alleged possession of a rusted piece of metal on September 26, 2014, should be marked as a "major" infraction, which resulted in Cooper being kept in segregation while he awaited his disciplinary hearing. Third Am. Compl. ¶ 17. Frederick took this action on the morning of September 27, three days before Cooper's hearing. *Id.* ¶¶ 17, 20. There is no allegation that Frederick participated in any way in the Adjustment Committee hearing itself, or in the Committee's decision not to call witnesses. So he is not a proper defendant in this action.

Cooper alleges that Frederick "also supported and turned a 'BLIND EYE' to the malicious and reckless conduct of the defendant[s] Carnahan, Shevlin, Johnson and Taylor" when he decided to keep Cooper in segregation. Third Am. Compl. ¶ 17 (capitalization in original). Setting aside the question of whether Frederick had supervisory authority over those individuals, Frederick's attitude towards their actions is irrelevant to the question of his involvement in the violation of Cooper's due process rights in this case, which turns on the refusal to call his witnesses. The "blind eye" argument is no more successful with Frederick than it was with Johnson, and Cooper has failed to state a claim against Frederick.

16

### 5. Range

Michael Range allegedly served as the "hearing investigator" for the disciplinary action. Third Am. Compl. ¶ 18. Cooper does not explain what this means, exactly, or what responsibilities a hearing investigator has, except to allege that he should have conducted an independent investigation into the incident like McBee did. *Id.* But once again, Range's involvement in the case is alleged to have taken place on September 27, three days before Cooper's hearing. *Id.* Cooper makes no allegations linking him to the decision not to call witnesses. No claim has been stated against Range.

### 6. Williams

Warden Tarry Williams's involvement merits slightly closer scrutiny, but at this stage it appears that he, too, is safe. The Seventh Circuit has explained that "a prison official's knowledge of prison conditions learned from an inmate's communications can, under some circumstances, constitute sufficient knowledge of the conditions to require the officer to exercise his or her authority and to take the needed action to investigate and, if necessary, to rectify the offending condition." *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996). Cooper did communicate with Williams about his situation, but the question is whether his correspondence sufficiently notified Williams about the constitutional deprivation such that after reviewing the correspondence, Williams "approved it, turned a blind eye to it, failed to remedy it, or in some way personally participated." *Id.* at 994 (citing *Gentry*, 65 F.3d at 561). Even

accepting Cooper's allegations as true and drawing reasonable inferences in his favor, he has not alleged facts to support his claim against Williams.

Cooper alerted Williams to his plight on several occasions. On September 29, Cooper wrote Williams a letter asking for the September 26 incident to be investigated. Third Am. Compl. ¶ 19. The letter is attached to the complaint, and although difficult to read, Cooper appears to be asking to take a lie detector test about the metal found outside his cell. R. 135 at 27, Exh. 2, Cooper Letter 1. The letter does not appear to mention witnesses, and cannot be about the Adjustment Committee's refusal to call witnesses, which would not happen until the following day. Williams responded to Cooper's letter with a boilerplate assurance that Williams would look into his concerns. Third Am. Compl. ¶ 23; Williams Letter 1. Cooper sent Williams another letter in December, when he had been in segregation for over two months. Cooper Letter 2. This letter is nearly impossible to read, but it does not appear to refer to witnesses, and in his complaint, Cooper characterizes it as "begging to be release[d] from seg." Third Am. Compl. ¶ 28; Cooper Letter 2. Neither letter put Williams on notice of the constitutional deprivation that Cooper experienced.[7]

Cooper also alleges that Williams did not agree with Grievance Officer McBee that Cooper's disciplinary record should be expunged. Third Am. Compl. ¶ 26. Even accepting that as true, Williams's disagreement cannot have been a violation of

---

[7] The first time Cooper complained of not being allowed to call witnesses appears to have been in his grievance of December 4, 2014. Third Am. Compl. ¶ 30; December Grievance. Cooper does not allege that Williams ever saw this grievance.

Cooper's due process rights unless Williams was in some way condoning or affirming the Adjustment Committee's refusal to hear from any witnesses. *See Gentry*, 65 F.3d at 561 (holding that a pro se complaint could be reasonably construed to allege that a prison superintendent "knew of the denial of scribe materials, even if only by the many letters [the plaintiff] sent him."). Unlike Johnson and Frederick, Williams arguably *was* in a supervisory position over the rest of the prison staff, and therefore could potentially be held responsible for their actions if he "turned a blind eye," as Cooper alleges. But Cooper has not alleged that Williams knew about the Adjustment Committee's decision not to call witnesses, let alone that he approved of that decision or turned a blind eye to it. His letters did not put Williams on notice about the witness issue, and McBee's Report likewise does not explicitly refer to witnesses.

Moreover, although Williams clearly had *some* authority in the prison as warden, Cooper has not established that the correct procedure to have his discipline reconsidered involved a direct letter to Williams. Although he includes several prison regulations from the Illinois Administrative Code in his brief, none of them illuminate the role of the warden in day-to-day discipline like the kind imposed on Cooper. Pl.'s Resp. at 3–6. Cooper appears to have corresponded with Williams only through his handwritten letters, not through any formal appeals process. It is entirely possible that even if Williams were aware of the Committee's decision, he did not have the authority to overturn it, if he was not in the chain of review—at least at that stage in the disciplinary process. But the question is academic, because Cooper has not alleged that Williams knew about the issue with the witnesses.

19

## 7. Summary

All of the defendants except for Best and Acklin must be dismissed from this case. Cooper has not alleged that they participated in the deprivation of his due process rights, either by contributing to or by ratifying Best and Acklin's decision not to call any witnesses.

Towards the end of his statement of claim regarding the disciplinary process, Cooper alleges that *all* of the Defendants "maliciously and intentionally turned a blind eye and with culpable knowledge allowed the wrongful conviction of Plaintiff to last for approximately 9-months." Third Am. Compl. at 19–20 (unnumbered paragraph). This is a conclusory allegation that adds nothing to the more specific allegations about each defendant that the Court has already considered. It does not affect the Court's decision.

Many of Cooper's complaints against the dismissed defendants boil down to complaints that they conducted an inadequate investigation into his alleged misconduct. But he does not point to any authority suggesting that an inmate has a right to a thorough and impartial investigation of misconduct, and this Court is aware of none. The Seventh Circuit has clearly set out the due process rights of prisoners facing discipline, and they do not include a right to such an investigation. *Rasheed-Bey*, 969 F.2d at 361. Prisoners *do* have a right to present witnesses and evidence relevant to the proceedings against them—in effect, to conduct an independent investigation and present its fruits—and that is why Cooper's case remains alive against Best and Acklin.

20

It is conceivable that Cooper has information that would allow him to plead the facts necessary to support his claim against some of the defendants that the Court is dismissing today. Although he takes issue with the performance of every correctional officer involved in his discipline, he accuses nobody except Carnahan (who has been dismissed already) of fabricating evidence against him, which *might* be adequate basis for a due process claim, together with the allegations that he did not receive due process during his actual hearing. In criminal proceedings, "law enforcement officers 'may not knowingly use false evidence, including false testimony, to obtain a tainted conviction.'" *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 344 (7th Cir. 2019) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). But "a prison disciplinary proceeding is not a criminal prosecution and the full panoply of rights due a defendant in such proceedings does not apply." *Hanrahan v. Lane*, 747 F.2d 1137, 1140 (1984) (cleaned up); *see also McPherson v. McBride*, 188 F.3d 784, 787 (7th Cir. 1999). The Seventh Circuit has explained that when an inmate otherwise receives the due process protections discussed earlier in this Opinion, a prison guard's fabrication of evidence does not violate his due process rights, because the prisoner has the right to refute that evidence during the hearing. *Hanrahan*, 747 F.2d at 1141. The converse is likely also true: if an inmate does *not* receive his due process rights in his hearing, the earlier fabrication of evidence might count as an additional due process violation. If Cooper wishes to add facts about fabricated evidence, or facts linking any of the defendants *directly* to the decision not to call witnesses at his

21

hearing, then he may file another motion to amend his complaint, which the Court will consider.

## IV. Conclusion

For the reasons discussed in this Opinion, Best and Acklin's motion to dismiss is denied, but the Court grants the motion of the rest of the Defendants: the complaint is dismissed as to Frederick, Johnson, Shevlin, Taylor, Range, and Williams. The dismissal is without prejudice, as explained in the Opinion.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: December 27, 2021